# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| NORMA BANUELOS, | Case No. 1:19-cv-01652-SKO |
| Plaintiff, | |
| v. | ORDER ON PLAINTIFF'S SOCIAL SECURITY COMPLAINT |
| ANDREW SAUL, Commissioner of Social Security, | |
| Defendant. | (Doc. 1) |

_____/

## I.    INTRODUCTION

On November 22, 2019, Plaintiff Norma Banuelos ("Plaintiff") filed a complaint 42 U.S.C. §§ 405(g) and 1383(c) seeking judicial review of a final decision of the Commissioner of Social Security (the "Commissioner" or "Defendant") denying her applications for disability insurance benefits ("DIB") and Supplemental Security Income (SSI) under the Social Security Act (the "Act").  (Doc. 1.)  The matter is currently before the Court on the parties' briefs, which were submitted, without oral argument, to the Honorable Sheila K. Oberto, United States Magistrate Judge.[1]

---

[1]  The parties consented to the jurisdiction of a U.S. Magistrate Judge.  (Docs. 7, 8.)

## II.      BACKGROUND

On February 29, 2016, Plaintiff protectively applied for DIB and SSI payments, alleging she became disabled on April 10, 2015, due to fibromyalgia, anemia, endometriosis, arthritis, hernia surgery, depression, and anxiety.  (Administrative Record ("AR") 21, 71, 86, 103, 118, 138, 146, 274, 279, 436, 503, 510, 530, 585.)  Plaintiff was born on August 7, 1968, and was 46 years old on the alleged disability onset date.  (AR 31, 70, 85, 250, 274, 342, 351.)  Plaintiff has high school education and can communicate in English.  (AR 31, 49, 83, 98, 278, 280, 494, 496, 534, 538, 592, 1021.)

### A.      Relevant Medical Evidence[2]

#### 1.      Sierra View Medical Center Emergency Department

On April 14, 2014, Plaintiff presented with vomiting, diarrhea, abdominal pain, and cramping.  (AR 1250–52.)  Tenderness was noted, otherwise her physical and psychiatric examinations were normal.  (AR 1251.)

Plaintiff presented with complaints of epigastric abdominal pain, nausea, and vomiting on April 7, 2016.  (AR 1149–53.)  Her general appearance was described as alert, appropriate, and well-nourished with no acute distress.  (AR 1149.)  Plaintiff's physical examination was normal, including full range of motion and no tenderness.  (AR 1149–50.)

On May 9, 2016, Plaintiff again complained of abdominal pain.  (AR 1106–11.) Plaintiff's examination was normal, including normal mood and affect.  (AR 1107.)

On March 15, 2017, Plaintiff complained of difficulty breathing.  (AR 1084–89.)  Her physical and mental status examinations were normal.  (AR 1084–85.)  Plaintiff presented with chest tightness on March 29, 2017, and a normal physical examination.  (AR 1067–72.)  She was described as cooperative, with a normal mood and affect.  (AR 1068.)

On April 3, 2018, Plaintiff presented with anxiety and requesting a refill of her medications.  (AR 1057–59.)  Her physical and mental status examinations were normal, yet she was diagnosed with anxiety disorder.  (AR 1058.)

---

[2] Because the parties are familiar with the medical evidence, it is summarized here only to the extent relevant to the contested issues.

Plaintiff again presented requesting a refill of her anti-anxiety medication on May 23, 2018.  (AR 1040–43.)  Her physical and mental status examinations were normal, but she appeared anxious.  (AR 1041.)

### 2.    Family Healthcare Network Porterville

On March 6, 2015, Plaintiff presented for an appointment following discharge from the emergency room for joint pain.  (AR 496.)  She reported a negative CT scan and that she was "overall feeling better," yet continued to have body aches and joint pain.  (AR 496.)  Plaintiff was noted to be pleasant, alert, well-developed, and well-nourished.  (AR 496.)  Her physical examination was normal, including normal (5/5) strength in her upper and lower extremities.  (AR 496.)  Plaintiff followed up for lab results on March 11, 2015.  (AR 969–72.)  As before, Plaintiff presented with a pleasant appearance and her physical examination was normal.  (AR 971.)

Plaintiff presented for a follow-up appointment on April 15, 2016, to treat her anxiety.  (AR 555–57.)  Her mental status examination showed Plaintiff to be alert, oriented, with cognitive function intact.  (AR 556.)  Plaintiff was noted to be cooperative with the exam, with good eye contact, good judgment and good insight.  (AR 556.)  Her mood/affect was full range with clear speech.  (AR 556.)  No auditory or visual hallucinations were noted.  (AR 556.)  Plaintiff was assessed with adjustment disorder with mixed anxiety and depressed mood.  (AR 556.)

On May 3, 2016, Plaintiff presented with complaints of chest pain.  (AR 549–51.)  She was observed to be alert, well developed, and well nourished.  (AR 549.)  Her physical examination was normal.  (AR 549–50.)  She was assessed with anxiety disorder and advised to continue her medications.  (AR 550.)  Plaintiff followed up with an appointment on May 10, 2016, having been admitted to the emergency room for internal bleeding.  (AR 544–46.)  Her physical examination showed epigastric tenderness, but was otherwise normal.  (AR 545.)

Plaintiff presented with complaints of jaw and rib pain on October 10, 2016.  (AR 537–38.)  She was noted to be in no acute distress, well developed, and well nourished.  (AR 538.)  Examination of Plaintiff's chest showed tenderness on palpation of chest wall and ribcage, and

she was assessed with fibromyalgia and chondrocostal junction syndrome.  (AR 537–38.)  On December 15, 2016, Plaintiff attended a follow up appointment following hospitalization for chest tightness that radiated to her jaw.  (AR 534–36, 918–920.)  On examination, Plaintiff appeared anxious with a depressed mood, sad affect, and intact cognitive function.  (AR 535, 919.)  She was cooperative and had good eye contact, with fair judgment and insight.  (AR 535, 919.)

On March 31, 2017, Plaintiff presented with complaints of trouble with eating and digestion and to establish care.  (AR 914–17.)  Her physical examination was normal, with well-developed and well-nourished appearance, full range of motion, no tenderness, normal strength, and normal gait.  (AR 916.)  Plaintiff's mental status examination was also normal.  (AR 916.)

Plaintiff presented for a follow up appointment on June 23, 2017.  (AR 782–85.)  Plaintiff was cooperative and her mental status examination normal, with good eye contact, judgment, and insight.  (AR 784.)

### 3.     Bakersfield Neuroscience & Spine Institute

Complaining of "generalized pain" and stiffness, Plaintiff presented for a neurological consultation on April 8, 2015, following a referral.  (AR 888–89.)  She also complained of anxiety.  (AR 888.)  Plaintiff's examination was normal, including full range of motion in her joints and normal mental status.  (AR 889.)  The evaluator stated that he was "not very sure whether we are dealing with a neurological situation," and ordered further testing.  (AR 889.)  He noted that if the studies were normal, Plaintiff would "most likely benefit from a rheumatological evaluation."  (AR 889.)

### 4.     Daniel Watrous, M.D.

On April 21, 2015, Plaintiff presented to Dr. Watrous for a rheumatological consultation.  (AR 468–70.)  She reported having diffuse body pains since childhood, but all testing has been unremarkable.  (AR 468.)  Examination of Plaintiff's peripheral joints revealed no active synovitis, erythema, increased warmth, or effusions.  (AR 469.)  No deformities or significant loss of range of motion were noted.  (AR 469.)  Dr. Watrous found no evidence of vasculitis, tendonitis, or bursitis in Plaintiff's peripheral tissues, but observed moderate fibromyalgia tender

point tenderness.  (AR 469.)  Examination of Plaintiff's spine showed normal curvature and good range of motion with mild tenderness in the paraspinal muscles only.  (AR 469.)  She was assessed with fibromyalgia with a history of anxiety and depression.  (AR 469.)

On November 17, 2015, Plaintiff complained of pain in her joints.  (AR 895–96.) Plaintiff's joint examination showed moderate tenderness in her left TMJ joint, left arm, left shoulder, left upper arm, left elbow, left forearm, wrists, hands, and left thumb, with no swelling, redness, effusion, or loss of motion.  (AR 896.)  Dr. Watrous also noted mild tenderness in Plaintiff's neck, back, left leg, left thigh, left knee, left ankle, and left foot, with no swelling, redness, effusion, or loss of motion.  (AR 896.)

Plaintiff complained to Dr. Watrous of pain in her left shoulder on February 4, 2016.  (AR 454.)  Examination of Plaintiff's joints showed moderate tenderness and mild swelling, with no redness, effusion, or loss of motion in her upper back.  (AR 455.)  Moderate tenderness was also noted in Plaintiff's fibromyalgia points, as well as tenderness to her Trapezius muscle, which Dr. Watrous noted was possibly tendonitis or the result of a strain.  (AR 455.)

On May 11, 2016, Plaintiff presented to Dr. Watrous with pain in her fingers.  (AR 658–59.)  Examination of Plaintiff's joints revealed moderate tenderness, with no swelling, redness, effusion, or loss of motion.  (AR 659.)  Dr. Watrous assessed Plaintiff with "[o]steoarthritis [p]olyosteoarthritis" and lumbago (low back pain).  (AR 659.)

Plaintiff complained of jaw and rib pain on October 5, 2016.  (AR 655–57.)  Dr. Watrous noted Plaintiff's MRI results, which showed "bony hypertrophy bilaterally at L5/S1 with mild disc protrusion"; "facet degenerative spondylosis at L5/S1"; "midlevel degenerative disk changes with mild post disk bulging"; "C5/6 focal protrusion and slight extrusion of disc"; "subtle spinal cord deformation"; and "mild to moderate central canal stenosis."  (AR 655.)  On examination, Plaintiff had moderate tenderness in her joints, but no swelling, redness, or effusion.  (AR 656.) There was mild to moderate loss of motion in Plaintiff's TMJ joints, neck, shoulders, wrists, hips, left knee, and big toes.  (AR 656.)  Dr. Watrous noted tenderness and tightness around Plaintiff's rib cage.  (AR 656.)

On December 16, 2016, Plaintiff presented to Dr. Watrous with worsening jaw and face

pain.  (AR 652–54.)  Examination of Plaintiff's joints showed mild to moderate tenderness and mild swelling, with no redness or effusion.  (AR 653.)  Plaintiff also had mild loss of motion in her bilateral TMJ joints, neck, right arm, right shoulder, right wrist, right hand and fingers, upper back, and the bilateral knees.  (AR 653.)  Plaintiff showed symptoms of depression.  (AR 652.)

Plaintiff complained to Dr. Watrous on February 2, 2017, of pain to her thoracic spine with burning sensation that radiated to her jaw and shoulder blades.  (AR 648–51.)  On examination of Plaintiff's joints, mild to moderate tenderness and mild swelling was noted, with no redness, effusion, or loss of motion.  (AR 649.)  Plaintiff had moderate tenderness in her fibromyalgia points.  (AR 649.)  Dr. Watrous also noted Plaintiff's rib cage was very tight and that she had a hard time taking deep breathes due to pain to thoracic area.  (AR 649.)  Symptoms of generalized anxiety and depression were present.  (AR 648.)

On March 14, 2017, Plaintiff presented with tightness to her chest and difficulty taking deep breaths.  (AR 644–47.)  Plaintiff's joint examination showed mild to moderate tenderness and swelling, with no redness or effusion.  (AR 645.)  Plaintiff also had mild loss of motion in her bilateral TMJ joints, shoulders, elbows, right wrist, thumbs and fingers, left knee, left ankle, left foot, and right toes.  (AR 645.)  Moderate tenderness in her fibromyalgia points was also noted. (AR 645.)  Symptoms of depression were present.  (AR 644.)

Plaintiff presented to Dr. Watrous on April 12, 2018, with knee pain and for a fibromyalgia follow up.  (AR 641–43.)  On examination, Plaintiff exhibited mild tenderness in her joints, with no swelling, redness, effusion, or loss of motion.  (AR 642.)  She reported having "difficulty with her mental health."  (AR 641.)

Dr. Watrous completed a physical medical source statement form on July 31, 2018.  (AR 624–27.)  He opined that Plaintiff could sit, stand, or walk for about two hours in an eight-hour workday.  (AR 625.)  According to Dr. Watrous, Plaintiff could use her hands, fingers, or arms for 25% of the eight-hour workday.  (AR 626.)  He found Plaintiff would be "off task" 25% or more of the workday, and was incapable of even "low stress" work due to her anxiety, depression, and panic attacks.  (AR 626.)

///

**5.      Emmanuel Fabella, M.D.**

On May 31, 2016, internist Dr. Fabella conducted an internal medicine evaluation. (AR 514–19.)  Plaintiff primarily complained of fibromyalgia, but also reported that she has osteoarthritis, depression, anxiety, GERD, and anemia.  (AR 514.)

Dr. Fabella noted Plaintiff was well-developed and fairly nourished.  (AR 516.) Examination for trigger points was positive over all areas tested.  (AR 516.)  Plaintiff had a mildly antalgic gait but intact balance, and did not require the use of assistive devices for ambulation.  (AR 516.)  Plaintiff had difficulty walking on her toes due to myalgias and left knee arthralgia.  (AR 516.)  Dr. Fabella found normal peripheral pulses in Plaintiff's extremities and symmetrical throughout.  (AR 517.)  There was no clubbing, cyanosis, or pedal edema seen.   Dr Fabella found Plaintiff had no joint deformities, effusions, warmth, swelling, crepitus or pain on motion.  (AR 517.)  No laxity of any joint was seen.  (AR 517.)

Dr. Fabella found normal range of motion in Plaintiff's shoulders, elbows, wrists, hips, and knees.   (AR 517.)   Examination of Plaintiff's hands showed early "Heberden's and Bouchard's nodes," and Plaintiff had decreased range of motion in Plaintiff's left knee with flexion was limited to 90 degrees.  (AR 517.)  The range of motion in Plaintiff's right knee was normal.  (AR 517.)  Dr. Fabella found Plaintiff had normal muscle bulk and tone without atrophy. (AR 517.)   Other than otherwise noted in Plaintiff's hands, her strength was "5/5" throughout. (AR 517.)

Dr. Fabella assessed Plaintiff with [f]ibromyalgia, not well-controlled and associated with fatigue" and "[a]rthralgias over the fingers and left knee, most consistent with early osteoarthritis. (AR 518.)  He opined that, given Plaintiff's impairments, she could: lift 10 pounds occasionally and less than 10 pounds frequently, due to arthralgias and myalgias; walk or stand four hours or less of an eight-hour day, secondarily due to arthralgias and myalgias; sit for 60 minutes at a time, after which a break is required, secondarily due to myalgias; climb, balance, kneel, and crawl occasionally, secondarily due to arthralgias and myalgias; never walk on uneven terrain, climb ladders, or work at heights, secondarily due to arthralgias and myalgias; and engage in fine fingering manipulation but with moderate impairment in gross manipulation using both hands,

secondarily due to arthralgias and myalgias.  (AR 518.)  Dr. Fabella found no limitations on hearing and seeing or any environmental restrictions.  (AR 518.)

### 6.    St. George Spine and Pain Institute

Plaintiff presented for an evaluation of her low back and bilateral extremity pain on June 23, 2016.  (AR 995–96.)  She displayed "no pain behavior" throughout the examination.  (AR 995.)  On examination, Plaintiff had positive tenderness in her low back, with limited range of motion but normal (5/5) muscle strength.  (AR 995.)  Plaintiff also had positive tenderness in her neck, with limited range of motion but normal (5/5) muscle strength.  (AR 996.)  She was accessed with cervical/lumbar radiculitis and myofascial pain syndrome.  (AR 996.)

### 7.    Roger A. Izzi, Ph.D.

On July 11, 2016, Dr. Izzi performed a psychiatric evaluation of Plaintiff.  (AR 522–25.)  Plaintiff complained of anxiety, depression, fibromyalgia, anemia, acid reflux disease, endometriosis, peptic ulcer, and osteoarthritis.  (AR 522.)  She reported that she lacks concentration due to pain and has had suicidal ideation in the past, although no specific intent was noted at that time.  (AR 522.)

Dr. Izzi observed Plaintiff was alert, responsive, and fully oriented.  (AR 523.)  Plaintiff's affect seemed dysphoric and she described feeling "worthless" and "sad."  (AR 523.)  On examination, Plaintiff was able to immediately recall three words without any obvious difficulty. (AR 522.)  Upon delayed recall, she was able to recall two of the three words.  (AR 523.)  Dr. Izzi observed Plaintiff could not spell the word "world."  (AR 523.)

Dr. Izzi diagnosed Plaintiff with a major depressive disorder with anxious stress, observing that Plaintiff's performance on the mental status examination "seemed satisfactory." (AR 524.)  He noted that Plaintiff's mood disorder would fluctuate as her subjective perception of pain fluctuates, and that there is likely to be some depression secondary to her awareness of loss of functional ability.  (AR 524.)  Dr. Izzi noted that Plaintiff is "not having any difficulty caring for basic hygiene" and that she "does appear capable of performing a simple repetitive type task on a consistent basis over an eight-hour period."  (AR 524.)  Dr. Izzi opined that Plaintiff's ability to get along with peers or be supervised in a work-like setting would be moderately limited by

her mood disorder, which will fluctuate.  (AR 524.)  He further opined that "[a]ny significant fluctuation of mood may limit [Plaintiff's] ability to perform a complex task on a consistent basis over an eight-hour period."  (AR 524.)  According to Dr. Izzi, Plaintiff appeared capable of responding to usual work sessions situations regarding attendance and safety issues and dealing with changes in a routine work setting.  (AR 524.)  She was also capable of managing her own finances.  (AR 525.)

### 8.    State Agency Physicians

On August 31, 2016, W. Jackson, M.D., a state agency physician, reviewed the record and assessed Plaintiff's physical residual functional capacity (RFC).[3]  (AR 78–80, 93–95.)  Dr. Jackson found that Plaintiff could: lift and/or carry 20 pounds occasionally and 10 pounds frequently; stand and/or walk for about six hours in an eight-hour workday; sit for about six hours in an eight-hour workday; perform unlimited pushing/pulling with the upper and lower extremities, subject to the lift and carry restrictions; occasionally climb ramps and stairs, balance, stoop, kneel, and crouch; and never crawl or climb ladders, ropes, or scaffolds.  (AR 78–80, 93–95.)  Dr. Jackson further found that Plaintiff had limited gross and fine manipulation in both hands.  (AR 78–80, 93–95.)  On reconsideration on January 10, 2017, another state agency physician, E. Christian, M.D., reviewed the record and affirmed Dr. Jackson's findings.  (AR 110–12, 125–27.)

State agency consultant Brady Dalton, Psy.D., reviewed the record and assessed Plaintiff's mental RFC on August 20, 2016.  (AR 80–82, 95–97.)  Dr. Dalton opined that Plaintiff had moderate limitations in the ability to: understand and remember detailed instructions; carry out detailed instructions, maintain attention and concentration for extended periods; perform activities within a schedule; maintain regular attendance; be punctual within customary

---

[3] RFC is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis of 8 hours a day, for 5 days a week, or an equivalent work schedule. TITLES II & XVI: ASSESSING RESIDUAL FUNCTIONAL CAPACITY IN INITIAL CLAIMS, Social Security Ruling ("SSR") 96-8P (S.S.A. July 2, 1996).  The RFC assessment considers only functional limitations and restrictions that result from an individual's medically determinable impairment or combination of impairments.  *Id*.  "In determining a claimant's RFC, an ALJ must consider all relevant evidence in the record including, inter alia, medical records, lay evidence, and 'the effects of symptoms, including pain, that are reasonably attributed to a medically determinable impairment.'"  *Robbins v. Soc. Sec. Admin*., 466 F.3d 880, 883 (9th Cir. 2006).

tolerances; complete a normal workday and workweek without interruptions from psychologically based symptoms; perform at a consistent pace without an unreasonable number and length of rest periods.  (AR 80–82, 95–97.)

On reconsideration on March 3, 2014, another state agency physician, S. Gold, M.D., reviewed the record and affirmed Dr. Dalton's findings.  (AR 112–14, 127–29.)

### 9. Kaweah Delta Medical Center Emergency Department

On November 30, 2016, Plaintiff presented with complaints of nausea and chest tightness. (AR 1310–22.)  Her physical examination was normal.  (AR 1314.)

Plaintiff was transported via ambulance for a mental health evaluation on April 4, 2017. (AR 1276–79.)  She reported depression as a result of "being in pain all the time," and exhibited suicidal ideations with a plan to "shoot herself in the head."  (AR 1276, 1305.)  On physical examination, palpation on Plaintiff's mid-chest reproduced her chest tightness.  (AR 1277.)  Her psychiatric examination showed her to be awake, alert, and cooperative, but also with a crying, apprehensive, uneasy, and tense affect.  (AR 1277.)  Plaintiff also exhibited an inability to express herself, irrational beliefs, and a lack of understanding of her current condition.  (AR 1280.)  She had reduced speech, depressed and anxious mood, with poor insight, poor judgment, and blunted affect.  (AR 1290.)  Plaintiff was admitted to the psychiatric department of the hospital due to being "actively suicidal" and in "guarded" condition.  (AR 1278, 1284, 1301) Upon discharge, Plaintiff was cooperative with good eye contact and feeling "hopeful," having achieved a "fair level of improvement."  (AR 1295–96.)  Her long-term prognosis was deemed "fair." (AR 1296.)

### 10. LAGS Spine and Sportscare Center

On June 14, 2017, Plaintiff presented with pain in her anterior chest wall, shoulder blades, and lower jaw.  (AR 871–76.)  She had normal range of motion in her cervical spine, with normal sensation, reflexes, and strength.  (AR 873–74.)  Plaintiff's lumbar spine range of motion was limited, and pain with motion was noted.  (AR 874.)  Her straight leg raising test was normal, as was her sensation in her lumbar spine.  (AR 874.)  Plaintiff's motor strength was abnormal (4/5) in her hip with abduction, and her lower extremity neurological examination showed abnormal

findings.  (AR 874.)

Plaintiff presented with back, leg, shoulder, jaw, and orofacial pain on May 24, 2018. (AR 817–20.)  Plaintiff's musculoskeletal examination was normal, with a negative straight leg raising test, normal sensation and strength, and normal range of motion in her spine.  (AR 818–19.)  No tenderness to palpation was noted.  (AR 818–19.)  Plaintiff was assessed with cervical spondylosis.  (AR 819.)

On September 4, 2018, Plaintiff complained of jaw pain and intercostal neuralgia.  (AR 806–810.)  Plaintiff's examination was normal, including full range of motion in Plaintiff's neck. (AR 808.)  It was also noted that Plaintiff exhibited a normal gait with no assistive device used for ambulation.  (AR 808.)

### 11.    Porterville Adult Clinic

Following her hospitalization for suicidal ideation in April 2018, Plaintiff was referred for an assessment on May 21, 2018.  (AR 1026–39.)  On examination, Plaintiff appeared cooperative, but with a confused attitude and "teary eyed" throughout.  (AR 1032.)  She exhibited "distorted" and "passive" thoughts about suicide, about which she thinks "daily."  (AR 1033.) The evaluator noted that Plaintiff's "impairments are evident in her interpersonal relationships, passive suicidal ideation plans but no intent, low-socio-economic status, physical illnesses.  [She] continues to need therapeutic and medication intervention.  [Her] symptoms are likely to decompose without continued services and support," resulting in a greater risk of psychiatric hospitalization.  (AR 1035–36.)

On June 7, 2018, Plaintiff presented for a psychiatric evaluation upon referral by her primary care physician.  (AR 1014–20.)  Her mood was described as depressed and anxious, with mildly impaired judgment and insight.  (AR 1016–17.)  Plaintiff was observed to be friendly and cooperative.  (AR 1017.)  She exhibited average intelligence.  (AR 1017.)  The evaluator also noted that Plaintiff "hears voices about three times a week telling her to kill herself" and "she gets paranoid thinking that people are watching her."  (AR 1017.)  Plaintiff was diagnosed with "[m]ajor depression, recurrent, severe with psychosis" due to her hearing voices and "panic disorder with agoraphobia."  (AR 1018.)

1          **12.     Jerry R. Livesay, Ph.D.**

2          On June 24, 2018, psychologist Dr. Livesay conducted a mental evaluation of Plaintiff.

3   (AR 600–06.)  He noted Plaintiff had appropriate eye contact and was cooperative throughout the

4   assessment.  (AR 600.)  She presented with a blunted affect and dysphoric mood and there was a

5   "sad quality to her overall demeanor."  (AR 600.)  Plaintiff spoke in a low volume, monotone

6   voice, and at a moderate rate speech delivery.  (AR 600.)  She complained of severe anxiety and

7   depression.  (AR 600.)

8          Dr. Livesay observed that Plaintiff was "able to concentrate in a reasonably sustained

9   fashion" and that she "worked fairly persistently at a moderate to slow pace."  (AR 601.)

10  Plaintiff had a "relatively blunted affect" and a "sad, dysthymic demeanor which persisted

11  throughout the assessment."  (AR 603.)  Her thought content "included themes of helplessness

12  regarding her medical problems."  (AR 603.)  Plaintiff reported "periods of tearfulness and

13  dysphoria in the morning such that it is difficult for her to get out of bed at least 2–3 times

14  weekly," which Dr. Livesay found "indicate[s] the presence of melancholia, as well as psychotic

15  features accompanying [Plaintiff's] depression."  (AR 603.)  Dr. Livesay found Plaintiff's

16  intelligence to be in the average range.  (AR 604.)

17         Dr. Livesay diagnosed Plaintiff with "[m]ajor [d]epressive [d]isorder, recurrent,

18  moderately severe, with mood congruent psychotic features, anxious distress, anhedonia and

19  melancholia"; "[p]anic [d]isorder, moderate," and "[i]nsomnia [d]isorder, comorbid to major

20  depression, moderately severe, frequent nocturnal awakenings."  (AR 605.)  He opined that

21  Plaintiff's ability to perform detailed and complex tasks, to interact with coworkers and the

22  public, and to perform work activities on a consistent basis without special or additional

23  instruction is mildly impaired.  (AR 605.)  Dr. Livesay further found that Plaintiff's ability to

24  maintain regular attendance and complete a normal workday/workweek without interruptions

25  from a psychiatric condition, and to deal with usual stress encountered in the workplace, is

26  moderately impaired.  (AR 605–606.)  He explained on the "Medical Source Statement,"

27  completed on July 2, 2018, that Plaintiff's major depressive disorder causes "auditory

28  hallucinations (i.e., 'voices') which make her paranoid around others" and her "low stress

tolerance, low volition, and psychotic features significantly limits her ability to adapt to change in routine." (AR 608.)

### 13.   Joseph Serra, M.D.

On June 29, 2018, orthopedist Dr. Serra conducted a comprehensive internal medicine evaluation of Plaintiff. (AR 611–15.) Plaintiff complained of pain in her neck and back as a result of fibromyalgia, anemia, endometriosis, arthritis, herniorrhaphy, depression, and anxiety. (AR 611.) She reported that has pain in her left knee and dizziness, as well as arthritis of the cervical spine. (AR 611.) Plaintiff also reported diagnoses of degenerative disc disease and intercostal neuralgia. (AR 611.)

Dr. Serra observed that Plaintiff was well-developed and well-nourished. (AR 612.) Plaintiff walked with a left antalgic gait and used a cane. (AR 613.) She had tenderness to palpation in her left knee. (AR 613.) Plaintiff's straight leg raising test was negative in the seated posture, other than causing pain in her lower legs. (AR 614.) Dr. Serra found Plaintiff's muscle strength, sensation, and reflexes were all normal. (AR 614.) He opined that Plaintiff's "subjective complaints far outweigh objective findings," as she "complains of pain everywhere as she is touched or examined." (AR 614.)

Dr. Serra diagnosed Plaintiff with impingement in her bilateral shoulder, musculoligamentous strain in her lumbar and cervical spine, and "functional overlay." (AR 614.) He concluded in his report that Plaintiff was limited to standing or walking up to six hours in an eight-hour day; sitting up to six hours per day; lifting and carrying 20 pounds occasionally and 10 pounds frequently; frequent climbing of stairs and steps; occasional climbing of ladders and scaffolds; frequent kneeling, balancing, stooping, crawling, and crouching; occasional overhead and forward reaching; and frequent handling, fingering, and feeling. (AR 614–15.) He also found Plaintiff's use of a cane was not medically necessary and that there were no workplace environmental limitations except for hazards. (AR 614–15.)

### B.   Administrative Proceedings

The Commissioner denied Plaintiff's applications for benefits initially on September 1, 2016, and again on reconsideration on January 26, 2017. (AR 100–101, 132–33, 138–43, 146–

51.)  Consequently, Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"). (AR 152–80.)  At the hearing on September 28, 2018, Plaintiff appeared with counsel and testified before an ALJ as to her alleged disabling conditions.  (AR 48–62.)

A vocational expert ("VE") testified at the hearing that Plaintiff had past work as an agricultural worker, Dictionary of Operational Titles (DOT) code 920.687-134, which was medium exertional work with a specific vocational preparation (SVP)[4] of 2; as an assembler, DOT code 706.684-022, which was light exertional work with an SVP of 2; as an office clerk, DOT code 219.362-010, which was light exertional work with an SVP of 2; and as a human resources clerk, DOT code 209.362-026, which was sedentary exertional work with an SVP of 4, performed at a medium level.  (AR 64–65.)

The ALJ asked the VE to consider a person of Plaintiff's age, education, and with her work background.  (AR 65.)  The VE was also to assume this person is limited to the light exertional level.  (AR 65.)  She could tolerate occasional ramps and stairs, but not use ladders, ropes, or scaffolding.  (AR 65.)  The individual could occasionally perform balancing, stooping, kneeling, crouching, and crawling, and could perform frequent handling and fingering bilaterally.  (AR 65.)  Finally, she would be able to perform non-complex routine tasks.  (AR 65.)  The VE testified that such a person could not perform Plaintiff's past work, but could perform other positions with light exertional level under the DOT in the national economy, such as office helper, DOT code 239.567-010, SVP 2; interviewer, DOT code 205.367-054, SVP 2; and salon attendant, DOT code 359.567-014, SVP 2.  (AR 65–66.)

The ALJ asked a follow up question regarding a second hypothetical worker who has the same limitations as the first, but also would be able to stand and walk for a total combined time of four hours in a workday.  (AR 66)  The VE testified there would be no light work available in the national economy that such a person could perform, and only sedentary jobs were available. (AR 66.)

---

[4] Specific vocational preparation, as defined in DOT, App. C, is the amount of lapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation.  DOT, Appendix C – Components of the Definition Trailer, 1991 WL 688702 (1991). Jobs in the DOT are assigned SVP levels ranging from 1 (the lowest level – "short demonstration only") to 9 (the highest level – over 10 years of preparation).  *Id.*

In the third hypothetical, the ALJ asked the VE to consider the limitations set forth in the second hypothetical, with the additional limitation that she would be able to attend a maximum of all but two days out of a work month, those days being missed unexpectedly due to pain, fatigue or mental health symptoms.  (AR 66.)  The VE testified there would be no work available in the national economy that such a person could perform.  (AR 67.)

Plaintiff's attorney posed a fourth hypothetical to the VE, concerning an individual who could lift and carry ten pounds occasionally and less than ten pounds frequently; stand and walk for four hours; sit for six out of eight hours but requires shifting of positions every hour; perform occasional climbing, balancing, kneeling, and crawling; must avoid uneven terrain; cannot climb ladders or work at heights; and perform occasional fingering and gross manipulation  in both upper extremities.  (AR 67.)  The VE testified such a person could not perform Plaintiff's past work or any work in the national economy.  (AR 67.)

**C.      The ALJ's Decision**

In a decision dated February 14, 2019, the ALJ found that Plaintiff was not disabled, as defined by the Act.  (AR 21–32.)  The ALJ conducted the five-step disability analysis set forth in 20 C.F.R. §§ 404.1520, 416.920.  (AR 23–32.)  The ALJ decided that Plaintiff had not engaged in substantial gainful activity since April 10, 2015, the alleged onset date (step one).  (AR 23)  At step two, the ALJ found Plaintiff's following impairments to be severe: osteoarthritis, fibromyalgia, and anxiety disorder.   (AR 23.)   Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 ("the Listings") (step three).  (AR 23–25.)

The ALJ then assessed Plaintiff's RFC and applied the RFC assessment at steps four and five.  *See* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4) ("Before we go from step three to step four, we assess your residual functional capacity . . . . We use this residual functional capacity assessment at both step four and step five when we evaluate your claim at these steps.").   The ALJ determined that Plaintiff had the RFC:

> to perform light work as defined in 20 CFR [§§] 404.1567(b) and 416.967 (b) and could tolerate occasional ramps and stairs; could not use ladders, ropes, or

scaffolding; could occasionally perform balancing, stooping, kneeling, crouching, and crawling; could perform frequent handling and fingering bilaterally; and could perform non-complex, routine tasks.

(AR 25–30.)  Although the ALJ recognized that Plaintiff's impairments "could reasonably be expected to cause the alleged symptoms[,]" she rejected Plaintiff's subjective testimony as "not entirely consistent with the medical evidence and other evidence in the record." (AR 26.)

The ALJ determined that, given The ALJ found that Plaintiff could not perform any of her past relevant work. (AR 30–31). Nonetheless, the ALJ determined that Plaintiff could perform alternate jobs that exist in significant numbers in the national economy, such as office helper, interviewer, and salon attendant. (AR 31–32). Ultimately, the ALJ concluded that Plaintiff was not disabled at any time through the date of her decision. (AR 32.)

Plaintiff sought review of this decision before the Appeals Council, which denied review on September 25, 2019. (AR 1–8.)  Therefore, the ALJ's decision became the final decision of the Commissioner. 20 C.F.R. §§ 404.981, 416.1481.

## III.   LEGAL STANDARD

### A.   Applicable Law

An individual is considered "disabled" for purposes of disability benefits if he or she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).  However, "[a]n individual shall be determined to be under a disability only if [her] physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." *Id.* § 423(d)(2)(A).

"The Social Security Regulations set out a five-step sequential process for determining whether a claimant is disabled within the meaning of the Social Security Act." *Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999) (citing 20 C.F.R. § 404.1520); *see also* 20 C.F.R. § 416.920. The Ninth Circuit has provided the following description of the sequential evaluation analysis:

16

> In step one, the ALJ determines whether a claimant is currently engaged in substantial gainful activity. If so, the claimant is not disabled. If not, the ALJ proceeds to step two and evaluates whether the claimant has a medically severe impairment or combination of impairments. If not, the claimant is not disabled. If so, the ALJ proceeds to step three and considers whether the impairment or combination of impairments meets or equals a listed impairment under 20 C.F.R. pt. 404, subpt. P, [a]pp. 1. If so, the claimant is automatically presumed disabled. If not, the ALJ proceeds to step four and assesses whether the claimant is capable of performing her past relevant work. If so, the claimant is not disabled. If not, the ALJ proceeds to step five and examines whether the claimant has the [RFC] . . . to perform any other substantial gainful activity in the national economy. If so, the claimant is not disabled. If not, the claimant is disabled.

*Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005); *see, e.g.*, 20 C.F.R. § 416.920(a)(4) (providing the "five-step sequential evaluation process" for SSI claimants). "If a claimant is found to be 'disabled' or 'not disabled' at any step in the sequence, there is no need to consider subsequent steps." *Tackett*, 180 F.3d at 1098 (citing 20 C.F.R. § 404.1520); 20 C.F.R. § 416.920.

"The claimant carries the initial burden of proving a disability in steps one through four of the analysis." *Burch*, 400 F.3d at 679 (citing *Swenson v. Sullivan*, 876 F.2d 683, 687 (9th Cir. 1989)). "However, if a claimant establishes an inability to continue [his] past work, the burden shifts to the Commissioner in step five to show that the claimant can perform other substantial gainful work." *Id.* (citing *Swenson*, 876 F.2d at 687).

**B.   Scope of Review**

"This court may set aside the Commissioner's denial of [social security] benefits [only] when the ALJ's findings are based on legal error or are not supported by substantial evidence in the record as a whole." *Tackett*, 180 F.3d at 1097 (citation omitted). "Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. of N.Y. v. NLRB*, 305 U.S. 197, 229 (1938)). "Substantial evidence is more than a mere scintilla but less than a preponderance." *Ryan v. Comm'r of Soc. Sec.*, 528 F.3d 1194, 1198 (9th Cir. 2008).

"This is a highly deferential standard of review . . . ." *Valentine v. Comm'r of Soc. Sec. Admin.*, 574 F.3d 685, 690 (9th Cir. 2009). The ALJ's decision denying benefits "will be disturbed only if that decision is not supported by substantial evidence or it is based upon legal error." *Tidwell v. Apfel*, 161 F.3d 599, 601 (9th Cir. 1999). Additionally, "[t]he court will

uphold the ALJ's conclusion when the evidence is susceptible to more than one rational interpretation." *Id.*; *see, e.g.*, *Edlund v. Massanari*, 253 F.3d 1152, 1156 (9th Cir. 2001) ("If the evidence is susceptible to more than one rational interpretation, the court may not substitute its judgment for that of the Commissioner." (citations omitted)).

In reviewing the Commissioner's decision, the Court may not substitute its judgment for that of the Commissioner. *Macri v. Chater*, 93 F.3d 540, 543 (9th Cir. 1996). Instead, the Court must determine whether the Commissioner applied the proper legal standards and whether substantial evidence exists in the record to support the Commissioner's findings. *See Lewis v. Astrue*, 498 F.3d 909, 911 (9th Cir. 2007). Nonetheless, "the Commissioner's decision 'cannot be affirmed simply by isolating a specific quantum of supporting evidence.'" *Tackett*, 180 F.3d at 1098 (quoting *Sousa v. Callahan*, 143 F.3d 1240, 1243 (9th Cir. 1998)). "Rather, a court must 'consider the record as a whole, weighing both evidence that supports and evidence that detracts from the [Commissioner's] conclusion.'" *Id.* (quoting *Penny v. Sullivan*, 2 F.3d 953, 956 (9th Cir. 1993)).

Finally, courts "may not reverse an ALJ's decision on account of an error that is harmless." *Molina v. Astrue*, 674 F.3d 1104, 1111 (9th Cir. 2012) (citing *Stout v. Comm'r, Soc. Sec. Admin.*, 454 F.3d 1050, 1055–56 (9th Cir. 2006)). Harmless error "exists when it is clear from the record that 'the ALJ's error was inconsequential to the ultimate nondisability determination.'" *Tommasetti v. Astrue*, 533 F.3d 1035, 1038 (9th Circ. 2008) (quoting *Robbins*, 466 F.3d at 885). "[T]he burden of showing that an error is harmful normally falls upon the party attacking the agency's determination." *Shinseki v. Sanders*, 556 U.S. 396, 409 (2009) (citations omitted).

## IV.        DISCUSSION

Plaintiff contends that the ALJ erred in rejecting portions of the opinions from her treating and examining and physicians without setting forth specific and legitimate reasons supported by substantial evidence. (*See* Doc. 17 at 12–22; Doc. 22.) Defendant counters that the ALJ properly reviewed the record and resolved the conflicting opinion evidence. (*See* Doc. 21 at 8–17.)

///

**A.     The ALJ Erred in the Evaluation of the Medical Opinion Evidence**

**1.     Legal Standard**

The medical opinions of three types of medical sources are recognized in Social Security cases: "(1) those who treat the claimant (treating physicians); (2) those who examine but do not treat the claimant (examining physicians); and (3) those who neither examine nor treat the claimant (non-examining physicians)." *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995). Ordinarily, more weight is given to the opinion of a treating professional, who has a greater opportunity to know and observe the patient as an individual. *Id.; Smolen v. Chater*, 80 F.3d 1273, 1285 (9th Cir. 1996). "To evaluate whether an ALJ properly rejected a medical opinion, in addition to considering its source, the court considers whether (1) contradictory opinions are in the record; and (2) clinical findings support the opinions." *Cooper v. Astrue*, No. CIV S–08–1859 KJM, 2010 WL 1286729, at *2 (E.D. Cal. Mar. 29, 2010). An ALJ may reject an uncontradicted opinion of a treating or examining medical professional only for "clear and convincing" reasons. *Lester*, 81 F.3d at 830. In contrast, a contradicted opinion of a treating or examining professional may be rejected for "specific and legitimate reasons that are supported by substantial evidence." *Trevizo v. Berryhill*, 871 F.3d 664, 675 (9th Cir. 2017) (citing *Ryan*, 528 F.3d at 1198); *see also Lester*, 81 F.3d at 830. "An ALJ can satisfy the 'substantial evidence' requirement by 'setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings.'" *Garrison v. Colvin*, 759 F.3d 995, 1012 (9th Cir. 2014) (quoting *Reddick v. Chater*, 157 F.3d 715, 725 (9th Cir. 1998)). "The ALJ must do more than state conclusions. He must set forth his own interpretations and explain why they, rather than the doctors', are correct." *Id.* (citation omitted).

"[E]ven when contradicted, a treating or examining physician's opinion is still owed deference and will often be 'entitled to the greatest weight . . . even if it does not meet the test for controlling weight.'" *Garrison*, 759 F.3d at 1012 (quoting *Orn v. Astrue*, 495 F.3d 625, 633 (9th Cir. 2007)). The regulations require the ALJ to weigh the contradicted treating physician

opinion, *Edlund*, 253 F.3d at 1157[5], except that the ALJ in any event need not give it any weight

if it is conclusory and supported by minimal clinical findings.  *Meanel v. Apfel*, 172 F.3d 1111,

1114 (9th Cir. 1999) (treating physician's conclusory, minimally supported opinion rejected); *see*

*also Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989).  The opinion of a non-examining

professional, by itself, is insufficient to reject the opinion of a treating or examining professional.

*Lester*, 81 F.3d at 831.

### 2.   Analysis of the ALJ's Treatment of the Opinion Evidence

#### a.   Dr. Watrous

On July 31, 2018, Dr. Watrous, who had been Plaintiff's treating physician for over three

years, completed a physical medical source statement form.  (AR 58, 624–27.)  He opined that

Plaintiff could sit, stand, or walk for about two hours in an eight-hour workday, and she could use

her hands, fingers, or arms for 25% of the eight-hour workday.  (AR 625–26.)  He found Plaintiff

would be "off task" 25% or more of the workday, and was incapable of even "low stress" work

due to her anxiety, depression, and panic attacks.  (AR 626.)  The ALJ accorded this opinion

"little weight."  (AR 29.)

Although not specifically identified by the ALJ as a basis for its rejection, Dr. Watrous's

opinion is contradicted by the opinion evidence of Disability Determinations Service medical

consultants Drs. Jackson and Christian, who opined that Plaintiff was able to lift and/or carry 20

pounds occasionally and 10 pounds frequently; stand and/or walk for about six hours in an eight-

hour workday; sit for about six hours in an eight-hour workday; and perform unlimited

pushing/pulling with the upper and lower extremities, subject to the lift and carry restrictions.

(AR 78–80, 93–95, 110–12, 125–27.)  Thus, the ALJ was required to state a "specific and

legitimate reason," supported by substantial evidence, for rejecting Dr. Watrous's opinion.

*Trevizo*, 871 F.3d at 675.

In reviewing the medical evidence and giving little weight to Dr. Watrous's opinion, the

ALJ stated that "[t]he record does not support the intensity of the above noted limitations and is

---

[5] The factors include: (1) length of the treatment relationship; (2) frequency of examination; (3) nature and extent of the treatment relationship; (4) supportability of diagnosis; (5) consistency; and (6) specialization. 20 C.F.R. § 404.1527.

thus inconsistent with the longitudinal record, as described in the analysis of the Disability Determination Services consultant opinions, above."  (AR 29.)

In her discussion of the opinions of Drs. Jackson and Christian (who assessed Plaintiff's alleged physical limitations), the ALJ described the longitudinal record as follows:

> [W]hile [Plaintiff] was diagnosed with fibromyalgia and osteoarthritis, she was also noted - in contradiction to the intensity of her allegations - as exhibiting 5/5 extremity strength, extremity ranges of motion within normal limits, intact balance, negative straight leg raising, a well-appearing and well-developed appearance, and a consultative examiner reported that her subjective complaints "far outweigh" objective findings.  (e.g. Exhibits IF/21/35/62, 6F, 9F/10, 13F, 16F, 19F/3/14/68/69, 20F, 21F/7, 24F/5/60, 25F/l 7, 28F/2/19/29/68/111/212, 29F/22/56).

(AR 28.)   Such description ignores contrary evidence in the records cited that supports Dr. Watrous's opinion.  For example, physical examinations of Plaintiff showing "extremity ranges of motion within normal limits" were nevertheless accompanied by findings of mild to moderate joint tenderness.  (*See* AR 455, 469, 642, 649, 659, 896.)  Although Plaintiff exhibited "5/5 extremity strength" during examinations, those examinations also showed limited range of motion in her knee (AR 517), back (AR 995), and neck (AR 996).  Examinations with "negative straight leg raising" test results also showed limited range of motion and pain in Plaintiff's low back (AR 874), weakened muscle strength in her hip joint (AR 874), abnormal neurological findings in her lower extremities (AR 874), and a diagnosis of cervical spondylosis (AR 819).  Where "intact balance" was noted, so too was antalgic gait.  (*See* AR 516, 613.)  Examiners noting Plaintiff's "well-appearing and well-developed appearance" assessed her at the same time with anxiety disorder (AR 550), chondrocostal junction syndrome (AR 538), arthralgias (AR 518), bilateral shoulder impingement (AR 614), musculoligamentous strain in her lumbar and cervical spine (AR 614).

While the ALJ's description of it implies the contrary, review of Plaintiff's longitudinal record shows that abnormal physical examination findings were not rare.  The existence of tenderness in Plaintiff's joints and fibromyalgia points was repeatedly noted in her examinations by Dr. Watrous and others over a four-year period.  (*See* AR 538, 645, 653, 656, 1251.)  Several of these examinations also showed loss of motion in her joints.  (*See* AR 645, 653, 656.)

An ALJ may properly discount a treating physician's opinion that is inconsistent with the medical record, including his own findings.  *See Valentine*, 574 F.3d at 692–93.  However, in so doing, an ALJ may not consider evidence that only supports the non-disability determination, while disregarding evidence that supports the contradictory opinion from a physician.  *See, e.g.*, *Holohan v. Massanari*, 246 F.3d 1195, 1207 (9th Cir. 2001) (finding that "the ALJ's specific reason for rejecting [a physician's] medical opinion [was] not supported by substantial evidence" because, in part, "the ALJ selectively relied on some entries in [the plaintiff's] records . . . and ignored the many others that indicated continued, severe impairment"); *see also Reddick*, 157 F.3d at 722–23 (An ALJ may not "cherry pick" from a record to support the conclusion, but rather must account for the context of the whole record.).  *See generally Gallant v. Heckler*, 753 F.2d 1450, 1456 (9th Cir. 1984) ("Although it is within the power of the [ALJ] to . . . weigh conflicting evidence, he cannot reach a conclusion first, and then attempt to justify it by ignoring competent evidence in the record that suggests an opposite result." (citations omitted)).

Here, the ALJ's conclusion that Dr. Watrous's opinion was "inconsistent with the longitudinal record" is based on isolated favorable portions of the record and does not account for it as a whole.  *See Attmore v. Colvin*, 827 F.3d 872, 875 (9th Cir. 2016) ("We cannot affirm, however, by isolating a specific quantum of supporting evidence, but must consider the record as a whole."); *Holohan*, 246 F.3d at 1205 (noting a treating physician's statements must be read in context of the overall diagnostic picture he draws).  The Court therefore finds that the ALJ's rejection of Dr. Watrous's opinion is not supported by substantial evidence.

### b.   Dr. Fabella

Consultative internist Dr. Fabella examined Plaintiff on May 31, 2016, and opined that, given Plaintiff's impairments, she: could lift 10 pounds occasionally and less than 10 pounds frequently; walk or stand four hours or less of an eight-hour day; sit for 60 minutes at a time, after which a break is required; climb, balance, kneel, and crawl occasionally; never walk on uneven terrain, climb ladders, or work at heights; and engage in fine fingering manipulation but with moderate impairment in gross manipulation using both hands.  (AR 518.)  Like the opinion of Dr. Watrous, Dr. Fabella's opinion is contradicted by the opinions of non-examining consultants Drs.

1   Jackson and Christian.  (*See* AR 78–80, 93–95, 110–12, 125–27.)

2       Although the ALJ gave "some weight" to Dr. Fabella's opinion, she did not specify
3   portion of the opinion she was adopting and what portion she was rejecting.  Comparing the
4   opinion to the RFC finding, it appears the ALJ intended to reject Dr. Fabella's opined lifting,
5   walking, standing, sitting, and bilateral hand gross manipulation limitations.  (*Compare* AR 25–
6   26 *with* AR 518.)  The ALJ apparently determined these limitations were "overly restrictive" and
7   "only somewhat consistent with the longitudinal record" as described in her analysis of the
8   opinions of the non-examining internal medicine physicians.  (AR 28.)  As set forth above,
9   however, the ALJ's description is impermissibly selective.  The Court therefore finds that it does
10  not constitute substantial evidence to support the rejection of portions of Dr. Fabella's opinion
11  based on a purported inconsistency with the longitudinal record.

12          **c.    Dr. Izzi**

13      Following an examination on July 11, 2016, consultative psychologist Dr. Izzi diagnosed
14  Plaintiff with a major depressive disorder with anxious stress, observing that Plaintiff's
15  performance on the mental status examination "seemed satisfactory."  (AR 524.)  Dr. Izzi opined
16  that Plaintiff's ability to get along with peers or be supervised in a work-like setting would be
17  moderately limited by her mood disorder, which would fluctuate.  (AR 524.)  He further opined
18  that "[a]ny significant fluctuation of mood may limit [Plaintiff's] ability to perform a complex
19  task on a consistent basis over an eight-hour period."  (AR 524.)  According to Dr. Izzi, Plaintiff
20  appeared capable of responding to usual work sessions situations regarding attendance and safety
21  issues and dealing with changes in a routine work setting.  (AR 524.)  She was also capable of
22  managing her own finances.  (AR 525.)

23      Although not specifically identified by the ALJ as a basis for its rejection, Dr. Izzi's
24  opinion is contradicted by the opinion evidence of Disability Determinations Service medical
25  consultants Drs. Dalton and Gold, who opined that Plaintiff had no social interaction or
26  adaptation limitations.  (AR 82, 97, 114, 129.)  Thus, the ALJ was required to state "specific and
27  legitimate" reasons, supported by substantial evidence, for her partial rejection of Dr. Izzi's
28  opinion.

The ALJ explicitly rejected Dr. Izzi's opined moderate limitation in Plaintiff's ability to get along with peers or be supervised in a work-like setting, finding it "not support[ed]" by the longitudinal record.  (AR 29.)  The ALJ accorded the remainder of the opinion "some weight," observing that it appeared "generally consistent" with the record "as described in the analysis of the Disability Determination Services consultant opinions, above."  (AR 29.)

The ALJ described the longitudinal record in her analysis of the opinion of consulting non-examiners Drs. Dalton and Gold (who assessed Plaintiff's alleged mental limitations) as follows:

> [W]hile [Plaintiff] has a history of psychological hospitalization and exhibited difficulties in recall and concentration tasks, she was also noted - in contradiction to the intensity of her allegations - as exhibiting average intelligence, intact cognitive functioning, the ability to concentrate in a reasonably sustained fashion with fair persistence at a moderate to slow pace, a pleasant and cooperative demeanor, and fair or good judgment and insight (e.g. Exhibits IF/62, 6F, 7F, 9F/7/l 7/22/27/28, 11F/5, 12F, 13F, 16F, 18F/124, 20F, 24F/5/8/60, 27F/l/15/l7, 28F/2/19/29/45/68/212, 29F/22/34/40/50).

(AR 29.)  As with her description of the longitudinal record documenting Plaintiff's physical impairments, the ALJ has selectively relied on some entries in Plaintiff's records and ignored others pertaining to her mental impairments.[6]  For example, during examinations where Plaintiff was noted to "exhibit[] an average intelligence," she was also found to be suffering from severe major depression with psychosis, due to her experiencing auditory hallucinations advising her to commit suicide.  (*See* AR 603, 608, 1016–17.)  A finding of "intact cognitive function" was coupled with a diagnosis of adjustment disorder.  (*See* AR 556.)  Whereas Plaintiff presented with "a pleasant and cooperative demeanor," she also exhibited a depressed and/or anxious mood (AR 535, 919, 1016–17, 1277, 1290), blunted and/or sad affect (AR 535, 919, 1277, 1290), confused attitude (AR 1032), irrational beliefs (AR 1290), distorted thoughts (AR 1032), reduced speech (AR 1290), daily suicidal thoughts (AR 1023), and poor insight and judgment (AR 1290).  On occasions where Plaintiff's insight and judgment were deemed "fair or good," she was

---

[6] Some of the evidence cited by the ALJ in her description bears little relation to it, in that it does not contain findings relating to Plaintiff's mental impairments. (*See, e.g.*, AR 514–19 (examination by internist Dr. Fabella); AR 545 (May 10, 2016 follow up appointment after hospitalization for internal bleeding); AR 596 (record of urine drug screen); AR 611–15 (examination by orthopedist Dr. Serra).)

observed to be anxious with a depressed mood and sad affect.  (*See* AR 535, 556, 919)  On other occasions, Plaintiff's insight and judgment were found to be either mildly impaired (AR 1016–17) or poor (AR 1290).

As discussed above, an ALJ may not, as she has done here, "cherry pick" evidence to fit a description of a claimant's mental impairment record that could support a conclusion of non-disability, while ignoring evidence that might not.  *See Holohan*, 246 F.3d at 1207; *Reddick*, 157 F.3d at 722–23; *Attmore*, 827 F.3d at 875.  Thus, the Court finds that the ALJ's conclusion that Dr. Izzi's opined moderate limitation in Plaintiff's ability to get along with peers or be supervised in a work-like setting was not supported by the longitudinal record lacks substantial evidence.

### d.      Dr. Livesay

Following a mental evaluation on June 23, 2018, Dr. Livesay, also a consultative psychologist, opined that Plaintiff's ability to perform detailed and complex tasks, to interact with coworkers and the public, and to perform work activities on a consistent basis without special or additional instruction is mildly impaired.  (AR 605.)  He further found moderate limitations in Plaintiff's ability to maintain regular attendance and complete a normal workday/workweek without interruptions from a psychiatric condition, and to deal with usual stress encountered in the workplace.  (AR 605–606.)

While according the opinion "some weight" and deeming it "generally consistent with the longitudinal record" as described in the analysis of the opinions of the non-examining mental health physicians, the ALJ nevertheless found Dr. Livesay's opinion of moderate impairment in Plaintiff's ability to maintain regular attendance not supported by the "objective evidence."  (AR 29.)  The ALJ does not specify to what "objective evidence" is she referring, and her failure to do so is erroneous.  *See Embrey v. Bowen*, 849 F.2d 418, 421–22 (9th Cir. 1988) ("To say that the medical opinions are not supported by sufficient objective findings or are contrary to the preponderant conclusions mandated by the objective findings does not achieve the level of specificity our prior cases have required . . . .");  *Garrison*, 759 F.3d at 1012–13 (An ALJ errs by assigning a medical opinion "little weight while doing nothing more than . . . criticizing it with boilerplate language that fails to offer a substantive basis for his conclusion.").  To the extent the

"objective evidence" is the same as that recited in the ALJ's description of the longitudinal record of Plaintiff's mental impairments, it is too selective to constitute substantial evidence, as the Court has previously found.

### 3.   Harmless Error Analysis

In light of the foregoing, the Court finds that the ALJ failed to provide specific and legitimate reasons supported by substantial evidence for rejecting the medical opinions of Drs. Watrous, Fabella, Izzi, and Livesay.  The Court cannot conclude that the error was harmless. *Molina*, 674 F.3d at 1115 (citing *Stout*, 454 F.3d at 1054).  If the ALJ were to have accepted any part of the rejected opinions, the ALJ likely would have reached an RFC determination with the greater limitations they recommended.  For example, the VE testified that a limitation to standing and walking for a total of four hours in workday (as opined by Dr. Fabella) would preclude all work at the light exertional level, leaving only sedentary work available.  (AR 66.)  A limitation of occasional fingering and gross manipulation in both upper extremities (germane to the opinions of Drs. Watrous and Fabella) would preclude all work.  (AR 67.)  In addition, missing two days of work a month due to pain, fatigue, or mental health symptoms (germane to the opinions of Drs. Watrous and Livesay) would also preclude all work.  (AR 66–67.)  Because a substantial likelihood exists that the ALJ's improper rejection of the medical opinion evidence affected the result and therefore was not "inconsequential to the ultimate nondisability determination," the error is not harmless.  *Molina*, 674 F.3d at 1121–22.

## B.   The ALJ's Error Warrants Remand for Further Proceedings

Where the ALJ commits an error and that error is not harmless, the "ordinary . . . rule" is "to remand to the agency for additional investigation or explanation." *Treichler v. Comm'r of Soc. Sec.*, 775 F.3d 1090, 1099 (9th Cir. 2014) (citations omitted).  The Ninth Circuit recognized a limited exception to this typical course where courts "remand[] for an award of benefits instead of further proceedings." *Id.* at 1100–01 (citations omitted); *see also id.* at 1100 (noting that this exception is "sometimes referred to as the 'credit-as-true' rule").  In determining whether to apply this exception to the "ordinary remand rule," the court must determine, in part, whether (1) "the record has been fully developed;" (2) "there are outstanding issues that must be resolved

before a determination of disability can be made;" and (3) "further administrative proceedings would be useful." *Id.* at 1101 (citations omitted).   As to the last inquiry, additional "[a]dministrative proceedings are generally useful where the record has not been fully developed, there is a need to resolve conflicts and ambiguities, or the presentation of further evidence . . . may well prove enlightening in light of the passage of time." *Id.* (citations omitted).  Ultimately, "[t]he decision whether to remand a case for additional evidence or simply to award benefits is in [the court's] discretion." *Swenson*, 876 F.2d at 689 (citation omitted).

Having found that the ALJ failed to articulate specific and legitimate reasons supported by substantial evidence for rejecting the medical opinion evidence, the Court further finds that the "credit-as-true" exception to the "ordinary remand rule" does not apply here.   As Plaintiff concedes (*see* Doc. 17 at 22; Doc. 22 at 4), additional administrative proceedings will be useful in this case, particularly to accord an opportunity to the ALJ to reconsider and resolve conflicts in the medical opinion evidence. *Cf. Dominguez v. Colvin,* 808 F.3d 403, 408–09 (9th Cir. 2016); *Lule v. Berryhill*, Case No.: 1:15-cv-01631-JLT, 2017 WL 541096, at *6 (E.D. Cal. Feb. 10, 2017) ("When there is conflicting medical evidence, 'it is the ALJ's role to determine credibility and to resolve the conflict.'") (quoting *Allen v. Heckler*, 749 F.2d 577, 579 (9th Cir. 1984)).   On remand, the ALJ should address this error by properly evaluating the opinion evidence and re-assessing Plaintiff's functional limitations considering that evaluation and the other medical evidence of record.

The Court will, therefore, remand this matter for further proceedings.

## V.        CONCLUSION AND ORDER

Based on the foregoing, the Court finds that the ALJ's decision is not supported by substantial evidence and is, therefore, VACATED and the case REMANDED to the ALJ for further proceedings consistent with this Order.  The Clerk of this Court is DIRECTED to enter judgment in favor of Plaintiff Norma Banuelos and against Defendant Andrew Saul, Commissioner of Social Security.

IT IS SO ORDERED.

Dated:   **February 25, 2021**                    /s/ *Sheila K. Oberto*

UNITED STATES MAGISTRATE JUDGE